Good morning. The first case we'll hear is Sabre, I guess, G.L.B.L. v. Shan. Numbers 18-2079 and 18-2144. I'm hoping you all can shed some light on this because I'm still scratching my head. I've been going back and forth on it. It's really hard. So go ahead and hopefully one of you will be able to persuade us. Yes, Your Honor. I will do my best. May it please the Court. My name is Patricia Peden and I represent Melody Shan. And with the Court's permission, I'd like to reserve five minutes for rebuttal. That'll be granted. In this appeal, Ms. Shan seeks to vacate one category of damages, and that is the category of saved development costs. And I think where the Court may be having some confusion is after I read the brief. Actually, most of my confusion, though, deals with – I have not prejudged this, and I'm only talking about myself. The attorneys' fees thing is really vexing. But I – but go ahead on your other argument, too. Okay. On your other argument, I have a couple of questions, because you offer a lot of reasons to question the damages calculation in this case. But I wanted to ask whether – doesn't the standard review prevent us from rejecting it? For example, the Head Start damage theory is somewhat novel, but doesn't it seem to be clearly foreclosed by existing case law? No, Judge Sanchez. I don't believe that that's true. You've got to admit, you have a high hill to climb. I do. And I am not hiding from the standard of review in this case at all. I understand that an appeal from an arbitration award, there are very narrow grounds for a federal court to not confirm an arbitration award. And I intend to address that head on, because this is one of those cases where, however narrow those grounds are, that they are met in this case. So your argument on the damages is this flies right into the face of carbo-ceramics. Yes, Your Honor. But carbo-ceramics is non-precedential, so it's not binding law. And carbo-ceramics is not a Texas Supreme Court case. I'm trying to understand why you think it's so clearly foreclosed by carbo-ceramics. So, Judge Bybus, it's not that it's precedential or that it's binding. It's that the arbitration agreement here required the arbiter to apply Texas law. If he went outside of Texas law, he would have exceeded his authority. The parties briefed Texas law to the arbitrator, and he identified carbo-ceramics as being the relevant authority. Right. When he issued his damages award, though, he clearly did not apply the law that he chose and he said would apply to the case. All right. Let's take carbo-ceramics on its face. It says here are three ways you can do it, but it doesn't say these are the exclusive ways. It suggests towards the end there might be other measures in appropriate cases. So it doesn't purport to be an exhaustive list of the ways allowed under Texas law. It's not an exhaustive list. I will say the Alcatel case that we cited in our brief and the university computing case out of Texas, there is, in the cases we cited, there's a clear line of authority in the Texas courts that although it's not exclusive, there are certain ways in which a party can calculate damages. Cite me a Texas president, ideally Texas Supreme Court, that squarely forecloses this measure of damages. I can't cite you a Texas Supreme Court case. There's a Texas Court of Appeals case that clearly forecloses this measure of damages. There is a federal court case. That's a Fifth Circuit case. It applies Texas law. Okay, but we all know when we're sitting in diversity or something, we're not making law. The Texas courts are free. We're guessing what they're going to hold. Right. So I think there are a couple of things that the arbitrator did here that are clearly foreclosed by Texas law. So let's start with what the arbitrator said he was awarding damages for. We don't have to guess, because in this case we have a reasoned award. And the interim award tells us that in Appendix 738, the theory he's awarding damages for, in a breach of fiduciary duty case involving theft of trade secrets, an employer may recover saved development costs. So he's awarding damages for saved development costs. The problem is, is he goes on to say there is no evidence of saved development costs. Can you explain to me, because I'm having a little bit of a difficulty understanding, because I think that he awarded for Head Start damages, and you seem to be suggesting that Head Start damages and saved development costs damages are the same. Yes. So the expert vigil called them Head Start damages. The arbitrator in the interim award is clear what he's calling them. He's calling them saved development costs. When I look at the final award, the arbitrator in Appendix 877-878 is separating them out into two separate paragraphs, with two separate headings. Yes, because Saber sought to prove damages, the saved development costs, in two different ways. They weren't two different legal theories. They were two different approaches to trying to prove up the damages. One, they were using Saber's development costs as a proxy for PISolution's development costs. And the arbitrator said, no, that's not acceptable. The Head Start damages were based on Vigil's report, where he's talking about saved development and operational costs that PISolution saved, and therefore gave it a two-year Head Start. But your whole argument depends on our accepting that these are not actually different theories, but they're just kind of heuristics, ways of proof, ways of inference here. But your adversary makes some powerful arguments that, in fact, Head Start is a different theory, and it's the theory on which the award actually rested. Well, Head Start was a different theory, in that it was premised on PISolution's saved development costs, and not Saber's. But they were still saved development costs. And so there are three. Under any authority, in any court, Texas or otherwise, a plaintiff has to be able to prove their damages. They cannot recover, and in this case it was a disgorgement theory. They cannot disgorge damages that it can't prove. And there are three uncontested facts in this case that I think compel reversal, even on the narrow grounds of review. First, no court anywhere, not in Texas, not anywhere, has ever applied this theory of recovery. That's not disputed. Saber told the district court this. It has never been applied. The facts of this case aren't novel. It's a standard breach of an employment agreement, right? It's that an employee allegedly violated an agreement and went to work for a competitor. I think you've subtly shifted the burden of proof. You said they haven't shown a case that proved it. But I think under the art of deferential review, you have to show a Texas case that forecloses it, and you keep retreating to a federal court of appeals case. But you don't have a Texas Supreme Court case. You don't have a Texas court of appeals case. You don't have a statute. Am I missing some authority that you have? I think I'm not sure if the university computing case is a Texas Supreme Court case. But what is clear under Texas Supreme Court authority under all of the cases is that a plaintiff has to prove their damages. The arbitrator here said, here's the damages that I'm awarding. They're saved development costs. There is no proof of saved development costs. Let's switch over to attorney's fees, because you don't have much time left. If that's OK. Yes, of course, Judge Garris. Go ahead. So on the attorney's fees issue, the party's agreement clearly, clearly specifies that neither party will be awarded attorney's fees. So what's the effect of the April 26, 2016 letter that says we're going by, JAMS says we're going by JAMS rules, and if you show up and make your presentation, it constitutes an agreement to the JAMS rules, and moreover points out that it is, JAMS standards are notwithstanding anything else that's already been signed by the parties. How do you square that away? Well, I don't need to, because the Supreme Court did it for us in Volt and in Stolt-Nielsen, where they said that what courts are, their first primary obligation under the FAA is to enforce the party's agreement. The party's agreement is crystal clear on the issue of attorney's fees. Let's talk about the party's agreement. Appendix 136 has the arbitration agreement. I'm looking at General Provisions, Roman numeral 3, paragraph B, Governing Law and Dispute Resolution. Texas law applies. They agree to binding arbitration. They agree they'll submit to JAMS in dispute within 30 days. It's going to be subject to JAMS policy, so we have this question about whether JAMS policy gets incorporated. Fifth sentence, all rights and defenses apply in arbitration, including the revision allowed of unenforceable terms. The sixth sentence, final decision, binding on the parties. So far, this has all been about how arbitration gets conducted. Then the seventh sentence says, the parties shall bear their own attorney's fees and shall bear equally the expenses of the arbitral proceedings, including without limitation the fees of the arbitrator. Now, your argument is not implausible, but taken on its own, the phrase shall bear their own attorney's fees might apply to all attorney's fees. But you have to show more than it's plausible. You have to show that the only possible reading of this whole paragraph is they shall bear all of their own attorney's fees here, even if not just the fees in arbitration, but the fees they'd be entitled to under New Jersey law, other provisions of law, et cetera. And I'm not sure, after reading all of those sentences about arbitration, that this isn't at least there's enough of an ambiguity that the arbitrator gets some deference in interpreting it. Yes, so this paragraph, as you've rightly pointed out, is organized in a certain way. It first talks about the procedure the parties will follow, and that's where the JAMS rules come, and then it talks about the substantive legal issues. And, you know, look, at the end of the day, the arbitrator doesn't get deference here because he never considered the JAMS rules in awarding attorney's fees. I'm setting aside the JAMS rules. Apart from the JAMS rules, don't the earlier sentences in the paragraph make it clear this is about how the arbitration itself is going to be conducted, who's paying for the arbitrator, don't they create enough ambiguity that the arbitrator can resolve it? I don't believe that that is true. I think that the language here when we're talking about, and particularly where it follows, right, we're talking about claims having all rights that would be available at law, and then immediately after talking about those claims, it says, oh, there are exceptions. Neither party is going to get their attorney's fees. So that's an exception to the claim. Are you familiar with the Quilloin case of ours? Your adversary cited it, albeit for a different proposition. I'm sure I've read it in the briefing. Okay, so Quilloin, that contract, in one sentence it said you and the company will be responsible for the fees and costs of your own respective legal counsel and any other expenses and costs such as costs associated with witnesses obtaining copies of hearing transcripts. So read on its own, looks like this is about, you know, you've got to pay your own fees, but it's connected with and you've got to pay court reporters and things. But there's also another sentence. This arbitrator has the authority to award any remedy that would have been available to you if he'd litigated the dispute in court under applicable law. We found because there were multiple sentences here and they pointed in somewhat different directions, that the contract language is ambiguous, the arbitrator gets to interpret it, and we deferred. Why is this case different? I think this case is different because I don't know who drafted the contract in that case, but here the contract was drafted by Sabre. It was given to my client on a take-it-or-leave-it basis. And so when we start under Texas law, which applies to this clause, and is in our reply brief, Texas law would hold that any ambiguity here gets applied against the drafter. And then when you look at the way that this particular clause is structured, the parties are very careful to say all rights and remedies and defenses in a court of law, but then they go on to have carve-outs, and it expressly says, and it applies to both parties, neither party is going to get their attorney's fees, and there's also a carve-out here for Sabre to get a TRO. So how do we square away what happened thereafter? Where, again, this letter that says, hey, JAMS applies, it supersedes everything, that's the rules of the road. Yeah. The Supreme Court has said that the parties' arbitration agreement controls. I think it is a very difficult argument for Sabre to say that JAMS procedural rules can come in and trump an express provision of a arbitration agreement, given how strongly the Supreme Court has been about applying and holding parties to their agreement. The JAMS are procedural rules, and those rules also say that a party is entitled and JAMS has no objection to them voluntarily limiting their remedies, which is exactly what Sabre did here. Yeah, I mean, but it's not exactly like the arbitrator just unilaterally imposed things on you and said this is what's going to be. The argument is that there was an agreement to basically amend or supersede what was in the original arbitration agreement through these other rules. There is both a legal and a factual response to that. Legally, Stolt-Nielsen says you can't do that. Yet just by volunteering to participate in arbitration is not enough to waive an express term of an agreement. And then – I mean, is this – I don't know if you do any trial work, but I was thinking of sort of the difference between your initial complaint and the final pretrial order, which lays out what the issues are. And I think there's a lot of authority that would say you go with the final pretrial order, which sets out sort of here's the issues for trial. Maybe that's a weak analogy. No, no, it is a good analogy. But I think, you know, here the contract, the agreement, says that it can't be modified but for in writing by all agreements by all parties. The JAMS procedural rules, there was no modification. It wasn't given to Ms. Shan as a modification of the agreement. She certainly didn't sign it. And if you follow the reasoning of the Supreme Court in Stolt-Nielsen, her participation in arbitration is not enough to waive it. With that. Okay. Thank you, counsel. We'll get you on rebuttal. Thank you. Thank you. May it please the Court, good morning. Christina Malfi from Gibbons PC in Newark, New Jersey, appearing on behalf of the cross-appellant Sabre GLB. Thank you for your time this morning. I will briefly address the damages issues and then turn to attorney's fees if that's okay with the Court. Sounds good. You've not contested the manifest disregard standard at all in this case, even though that was open law on our circuit. That's correct. Okay. So we have to take it. All right. We took the position, Your Honor, that it is open law on this circuit and that there's a circuit split. However, because the Third Circuit has not decided it, it didn't matter in this case that even under a manifest disregard standard, that the appellant would not have the appropriate grounds to vacate the damages award in this case. The head start damages theory seems to be a little bit novel. What case law supports this theory from your perspective? Well, the case that's cited by the appellant, this Texas advanced optoelectronic case out of the Federal Circuit July 2018 comes after the decision. Interestingly, in that case, cited by the appellant, not by my office, in that case, the Court does talk about head start. And this particular economic theory is recognized within economics. There's no reported case that we could find under Texas law that specifically provides that a head start damage is an appropriate theory of recovery, but there's not a case that says it's not. The Carbo Ceramics case specifically talks about here's four reasons, here's four theories you could follow for damages in this type of case. In addition, the plaintiff in that case came up with a fifth. And they said, well, this is okay, but it's speculative under the facts of that case. Then they say you need to be able to establish your damages in a flexible approach in a way that's consistent with the facts of the case, which is exactly what the expert did here. And I think it's important to note that here this is not a speculative decision on what the equity was when he determined the head start. He determined her percentage of the company, what was it worth given the head start that they had. Liability is admitted here, so we're not on appeal on liability. So given what happened, what is the head start? He utilized, and the appellate would like to forget this, but he utilized actual third-party investment in the company and said, okay, a third party, who obviously is not going to throw their money away for no good reason, invest in the company. This is how much the third party paid for the company, because the company had the benefit of the head start, which was more than development costs. It was operational. It was people. They raided and took our people, these people who were all bound by non-competes. They were in China, however. They moved them to China, and they all moved and took all their knowledge with them. It wasn't just save development costs. It had nothing to do with save development costs. So while the appellate would like to try to confuse the issue, it's very clear, I think Judge Harris or Judge Bevis, you pointed it out, that the expert had two different theories. It was a good question. It was me. Okay. I've heard of it. There were two different theories. One was save development costs. The other was head start damages, and that was based on what a third party paid after all of this intellectual property, after the trade secrets, the confidential information, the people, the customer information, the customer contacts. After all that went, what was the company now worth, and what was somebody willing to pay for it? Counselor, can I ask you to talk a little bit about the corporate veil issue? There are two sub-issues. I'm interested in the second one. It looks like the arbitrator did overlook ROI as a separate identity here, at least didn't say anything about it, and treated Shan as owning Pi Solutions, but she doesn't own shares in Pi Solutions. So is that legal error? And, you know, Shan didn't raise it. It may have been waived. We have discretion as to whether to overlook the waiver or not. But what do you have to say in response to that concern? Well, very early on, while Ms. Shan was still employed by Sabre, she incorporated ROIS. She was the sole shareholder of ROIS. ROIS then became the majority shareholder of Pi Solutions. But ROIS has a separate legal personnel. It is, a Hong Kong entity. And the arbitrator heard substantial testimony about ROIS and Pi Solutions and Ms. Shan. There was no need for us to pierce the corporate veil because it was Ms. Shan who did all these bad things. She did it. She wasn't hiding behind ROIS. Sabre and ROIS did not have a transaction between them. We were trying to get behind that. Except in computing 68% of the value of Pi Solutions' head start and requiring disgorgement of that amount, in essence, the arbitrator is pierced in the corporate veil to get at Pi Solutions' value and not just ROIS' value. I think, and I would be speculating somewhat here, I think the arbitrator likely viewed that she was 100% shareholder and, therefore, as the 100% shareholder of ROIS, she was getting the benefit, even though it flowed through ROIS. Okay, so what do we make of this? That the arbitrator, maybe the arbitrator tacitly did a veil-piercing analysis. There are places on the record where she says, you know, that's me or I owned it or I did this, which she seems to confuse the two, but didn't spell it out. So shouldn't the arbitrator have done more to justify piercing the veil? It's pretty fundamentally clear. I don't think the arbitrator has to spell out every specific finding or conclusion or decision that the arbitrator makes. In this case, the appellant was entitled to a reasoned decision, and the arbitrator provided a 16-page decision. In his final order, he specifically provided that if I didn't specifically reference a claim that was made here, it is denied. These issues were all before the arbitrator. He was very familiar with it. He made a decision. That decision is entitled to great deference, as we know, and even if he made a factual or legal error, Judge Bevis, as you suggest he may have under these circumstances, even if he did, that's not enough to change and to vacate the award in this case. The other thing I'd like to just point out is that, consistent with what you said earlier, there is no case, no case, that says that a company like Sabre, under the factual circumstances presented here, which was breach of fiduciary duty, breach of contract, by misappropriation of trade secrets and confidential information, under these circumstances, there's no case that says they cannot obtain Head Start damages. And it is the appellant's burden to come forward to show that this arbitrator exceeded his powers by ignoring clear precedent. There was no clear precedent here that he ignored. He was a former Texas judge. He made a decision as an arbitrator in this case, and that decision is entitled to great deference. If you like, I could turn to the attorney's fees issue. Yes, that would be great. Judge Sigaris, I agree this is very similar to the circumstances of Quilon, which was the 2012 decision from this court. That really was Judge Bevis. Oh, I'm sorry. You did say if it was a good question. Okay, all right. Don't aggrieve the guys. They all look alike. It is true. I just got to grow my beard. My apologies, Judge Bevis. My apologies. In that case, it's interesting. It's almost identical to what we're faced with here. It has specific language in the contract that talks about, you know, each party's going to bear their own fees. And then it says, but you're entitled to all remedies that you otherwise would be entitled to under law. And then it talks about the AAA rules. Now, you determined in that case, or the panel determined in that case, that that created an ambiguity in the contract, and it was for the arbitrator to decide. So we don't know, looking at the Quilon case, how the arbitrator would decide that, because the arbitrator didn't have a chance yet to decide it. But you did decide. It's not up for the court. It's not up to the court. It wasn't up to Judge Martini to substitute his judgment as to the ambiguity for the arbitrator's judgment. So I'd like to just go through some of the uncontentions. Even though they point out that you, your client, drafted the agreement, so it should be construed against the drafter of the agreement? Well, that's Judge Sanchez. That is interesting, because in the Quilon case, that was also drafted by the employer. There was no finding that it was an unconscionable contract. In fact, this court said, you need to go to arbitration. So there was arguments there that because that was drafted by the employer and she was forced to sign it. There's case law, including Quilon, which says, no, you go to arbitration. So once you get to arbitration, it is up to the arbitrator to decide the issue of ambiguity. But it's more than this is not a case where it's questionable as to whether the JAMS rules were applicable or not. Here, you have specific language that says that the JAMS rules are applicable. So there's no dispute here that the New Jersey Trade Secret Act permits attorney's fees. There's no dispute here that this arbitrator found a violation of the New Jersey Trade Secret Act, and that Ms. Shan, the appellant, had engaged in willful behavior, which would entitle Saber to attorney's fees. So there's no dispute on those things. There's no dispute that the minimum standards of JAMS, under which we proceeded, provides that all remedies should be available under all applicable law, as if you're in court. There's no dispute that both parties were provided with the minimum standards, consistent with the letter of Judge Scaris that you mentioned a minute ago. There's no dispute that we proceeded through the entire arbitration, consistent with the minimum standards, including that Saber had to pay the $75,000 or $80,000 for the arbitration. So despite the fact that the arbitration agreement itself said both sides are going to split the cost of the arbitration, JAMS said, oh no, there's the minimum standards. You, Saber, need to pay for the entire thing. Before you go on, your adversary responds. The Supreme Court case, the Stolt case, says otherwise. How do you respond to that? Well, because there, the minimum standards or the rules, or whatever it was that they wanted to do, was not within the four corners of the contract. Here, the minimum standards are specifically mentioned in the four corners of the arbitration agreement. It's not like all we have is that letter in April. Because in the actual arbitration agreement, and Judge Martini chose to ignore this part, and Appellant chooses to ignore this part, but in the arbitration agreement itself, it says that the arbitration will be conducted and subject to the minimum standards. All right, but a retort might be, look, the provision of the employment agreement says no attorney's fees. It also says it can only be modified in writing, signed by the parties, and it wasn't. That's correct, but I don't need that April letter for the attorney's fee award in this case to be vacated, to be reversed and reinstated. I don't need that letter because the actual agreement on its face, the arbitration agreement on its face, said that the parties agree in writing in the agreement that they are going to arbitrate subject to the minimum standards. The minimum standards, you know, Appellant wanted to argue that it's not an incorporation by reference. It certainly is an incorporation by reference. You don't have to lay out every one of the minimum standards in the agreement. In the agreement, it says the arbitration is going to be subject. She agreed to that at the beginning, so what happened in April was simply consistent with what the language of the agreement said originally. Judge Martini below just wanted to ignore that part. He says, well, I don't find that the minimum standards trump the express terms of the agreement, but the express terms of the agreement speak directly to the arbitration being subject to the minimum standards. So you can't ignore that part of the agreement. Now, I will confess that I could harmonize the two of them, right, and there is many different interpretations one can come to, but under the Quilon case, this court has said that's up for the arbitrator to decide. If it's up to the arbitrator to decide the ambiguity, then it's up to this court to only vacate if there's no plausible basis for the decision that the arbitrator made. So, for example, one plausible explanation is that the arbitrator thought to himself, well, in a fee-shifting case, that's what you would otherwise get in a court of law, and on the face of the agreement, it says you're not waiving that. So in a fee-shifting case, I get to shift the fees if at the end of the arbitration I find that attorney's fees are applicable, which is what he did here.  where you can harmonize the language. Is there some ambiguity? Clearly there is. You've recognized it, we've all recognized it, but he harmonized it. But as your adversary points out, doesn't that, according to general principles, go against the drafter? It would sometimes go against the drafter if the ambiguity cannot be harmonized with other plain language in the agreement and the course of dealing that followed. What the arbitrator needed to do was determine the intent of the parties. What was the intent? Well, the course of dealing that followed, everybody followed the JAMS minimum standards. That's what followed. That was clearly the intent of the parties. Both parties followed it. No one said, oh, wait a minute, wait a minute, that's not what the agreement says. That's not what happened here. So I think under those circumstances, the ambiguity does not get construed against the drafter because here it's not ambiguous in that sense. The language is there in the express language of the contract. And the court was able to look at the course of dealings after that to confirm that the intent of the parties was to follow that minimum standards. So there's, in my view, and this is the argument on behalf of my client, you have to be incredibly deferential to the arbitrator's decision here. And if there's any plausible explanation for how the arbitrator was able to read this contract in harmony to conclude that attorney's fees were applicable, this court should reinstate the attorney's fees. Does it matter that the arbitrator gives us no analysis as to why any conflict at all between the two, all the provisions? I mean, it seems that a person from JAMS is going to apply JAMS's rules as a matter of course. Was there any discussion over, I know that there's a conflicting provision in the employment agreement. We got ours. I find that whatever. There's nothing like that, right? Also, it just says here's attorney's fees. There certainly was significant briefing by both parties. So we can't conclude he didn't understand these issues or they were not presented to him. There was significant briefing by both parties post-judgment or post-award where the arbitrator had cases before him, had briefs before him. So it wasn't as if there was no analysis of the issue. In addition, I would like to point out the Ario case, which is a Third Circuit case from 2010, 618, Fed 3rd, 277. And in this case, the court said, it's so deferential is the irrationality standard under the FAA that we may not overrule an arbitrator simply because we disagree. There must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of the award. What page is that? That is at page 295-296. Hold on now. Okay, got it. 618, Fed 3rd, 295-296. 2010, Ario versus underwriting members. Okay. You're just about done. If you want to wrap up. I think that the only thing I would say is that the standard of review is very narrow here and that the appellant has not met that standard with regard to the damages issue and with regard to the attorney's fees issues. I believe that Judge Montini should be reversed because he did not appropriately allow the arbitrator to make the decision as to any possible ambiguity that may have existed in the contract. And in addition, he ignored the fact that the contract on its face said that the agreement was going to be subject to the minimum standards. Thank you. Thank you, counsel. Rebuttal? Yes, Your Honors. I'll start with the damages and then move on to the attorney's fees issue. First, I wanted to address Judge Bibas's question about Texas law and whether or not it precludes the damages in this case. I just want to point the court to the internal citation in Carbo Ceramics at pages 722 and 723, where there's an extensive discussion of the state of Texas law, including Supreme Court cases. And then also at page 11 of our reply brief, a cite to Southwest Energy Production Company, a Texas Supreme Court case from 2016 that held that when there's evidence from which damages can be calculated, things like financial records and the like, that you need to look at that evidence and you cannot base damages on speculative damages theory. I also wanted to address Judge Bibas's questions about the legal separateness issue in this case. There's no dispute that what the arbitrator did here was he used Royce's shares as a substitute for Ms. Shan's shares. Ms. Shan doesn't own shares. It is a separate legal entity, and there is no dispute about that. The arbitrator may not need... You made that argument. You never made that argument to the arbitrator. We've looked in the record. Can you cite me anywhere where you made this before? Yes. If you think it's going to take some doing, you could give us a 28-J letter answering that. Yes. But if you have it right at your fingertips, that would be... I would like to give a 28-J letter. This was our argument through the entire arbitration. And you heard Saber argue, well, Ms. Shan and all of these employees went off to China and did these things. But we have always maintained that Ms. Shan was the only defendant in this case. She's not responsible for other people's activities or for Pi Solutions' damages or their saved development costs or Head Start costs. The award of damages was for her own misconduct, not for any other entity that should have been a party to the lawsuit. It was for her own misappropriation of trade secrets and her misconduct in terms of disloyalty to the employer. So it's about her, not anyone else. I respectfully disagree. The liability finding was about her conduct. Absolutely. And we have not appealed to any of the liability finding. It's a different story when you start asking Ms. Shan, an individual of modest means, to disgorge and pay to Saber the entirety of whatever Pi Solution and any of those other individuals, what they gained from starting a competing business. Right? It's a separate issue. Yes, Ms. Shan is liable for her own conduct, and Saber was awarded $200,000 for disgorgement of her salary. Those damages are tied to her, and we haven't contested those. She cannot be made to pay for saved development costs from an entirely third-party entity who wasn't a defendant in the case, and that's what happened here. He calculated damages based on an entirely separate entity, the entirety of its value, and conduct that happened by people who were never in the arbitration. That's where it exceeded his authority, and it manifestly disregarded the law. So Saber said, well, we don't need to show that there's a piercing of the corporate veil because we can assume that the arbitrator decided that there was. He heard all of this evidence. The problem with that argument is that issue was never submitted to the arbitrator for him to make a decision about at all. It was never pleaded. It was never put in front of the arbitrator. Nobody ever asked him to make an alter ego finding, nor did he. He just assumed all of these three separate entities were all one and the same, and although the standard of review on appeal is very narrow, the idea of corporate separateness is so ingrained and so enshrined in our law that it cannot be anything other than a manifest disregard to lump three companies together and treat them as the same. The attorney's fees issue. So as I understand the exchange that your honors had with Saber, we're centering on whether or not the arbitration agreement is ambiguous, and I will respectfully submit to the court that what the arbitration agreement says is that Texas law is going to apply. And Texas law has a series of doctrines that you go through to decide in the context of one of these causes what its meaning is. So while the arbitrator might have discretion to determine if there's an ambiguity, the arbitration agreement tells him he has to apply Texas law to resolve that ambiguity. But the district court's finding was that the Texas law specification in the contract is for purposes of figuring out which law applies for interpreting the contract, not necessarily what the substantive rights are. This is a claim for attorney's fees entitled under a New Jersey statute. So it seems like that's just a choice of law provision, isn't it? Well, your honor, I think what the district court found, and what I think is entirely correct, is if you... It's our position that it's not ambiguous. It clearly says both parties are going to pay their own fees. But if you were to go down the road of saying, well, it's ambiguous and it's the arbitrator's decision to decide the ambiguity, he's not unfettered in how he does that. He has to apply Texas law in doing that. And when you go through that analysis, one of the things that Texas law holds, and it's in our brief, is that any ambiguity is construed against the drafter of the contract. So under Texas law, when he went to look at this, there were many things that would have told him that on these particular facts, in this case under Texas law, that attorney's fees could not be awarded. You agree with your friend across the aisle that this was briefed fully before the arbitrator? In other words, whether attorney's fees were available or not. I don't think it was fully briefed in front of the arbitrator. And part of that is because, again, the arbitration agreement applies Texas law, and Sabre was seeking attorney's fees under New Jersey law. So the parties agreed to apply Texas law. Sabre should have pleaded and sought damages under Texas law. That's what they were required to do here. They pleaded it under New Jersey law. There was a lot of back and forth. What was extensively briefed was the amount of the attorney's fees award once the arbitrator found that Sabre was entitled to fees. We did a lot of briefing around how much those were going to be, which was the first time these jams procedural rules were raised, was after the arbitrator had already found entitlement under New Jersey law. Thank you, counsel. Thank you. I'd like to thank both counsels for their excellent briefing and oral argument in this case. We'll keep the case under advisement.